IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| MURRAY REHRS, | ) | 4:05CV3014 |
| | ) | |
| Plaintiff, | ) | |
| vs. | ) | **MEMORANDUM** |
| | ) | **AND ORDER** |
| THE IAMS COMPANY and | ) | |
| PROCTOR AND GAMBLE, INC., | ) | |
| | ) | |
| Defendants. | ) | |

This employment discrimination case is before the court on cross-motions for summary judgment. The plaintiff, Murray Rehrs ("Rehrs"), who has Type I insulin dependent diabetes, sought an accommodation from the defendants, The Iams Company and Proctor and Gamble, Inc. (collectively, "P&G"), that would allow him to work straight shifts rather than rotating shifts as a warehouse technician.

Both summary judgment motions present two basic questions for the court's determination: (1) whether Rehrs has a "disability" within the meaning of the Americans with Disabilities Act ("ADA") and the Nebraska Fair Employment Practice Act ("NFEPA");[1] and (2) whether shift rotation is an essential function of his employment. As to the first question, I find there is a genuine issue of material fact regarding the severity of Rehrs' diabetic condition that precludes entry of summary judgment for either side. As to the second question, however, I find that P&G has made a sufficient showing that its production level employees all must work rotating

---

[1] Rehrs originally moved for summary judgment only on his ADA claim (filing 63), but subsequently filed a motion for leave to amend (filing 73) to include the NFEPA claim, and also an amended motion for leave to amend (filing 82) which adds a representation that P&G has no objection to the proposed amendment. I will deny the superseded motion for leave to amend (filing 73) as moot and will grant the amended motion (filing 82) instanter.

shifts, and that Rehrs has failed to refute such showing with competent evidence. Accordingly, I will grant summary judgment in favor of P&G and dismiss Rehrs' action with prejudice.

## I. DISCUSSION

Summary judgment should be granted only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). See also Egan v. Wells Fargo Alarm Servs., 23 F.3d 1444, 1446 (8th Cir.1994). It is not the court's function to weigh evidence in the summary judgment record to determine the truth of any factual issue. Bell v. Conopco, Inc., 186 F.3d 1099, 1101 (8th Cir. 1999). In passing upon a motion for summary judgment, the district court must view the facts in the light most favorable to the party opposing the motion. Dancy v. Hyster Co., 127 F.3d 649, 652 (8th Cir. 1997).

In order to withstand a motion for summary judgment, the nonmoving party must substantiate their allegations with "'sufficient probative evidence [that] would permit a finding in [their] favor on more than mere speculation, conjecture, or fantasy.'" Moody v. St. Charles County, 23 F.3d 1410, 1412 (8th Cir. 1994) (quoting Gregory v. City of Rogers, 974 F.2d 1006, 1010 (8th Cir. 1992)). "A mere scintilla of evidence is insufficient to avoid summary judgment." Id. Essentially the test is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251-52 (1986).

> [T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will

2

>bear the burden of proof at trial. In such a situation, there can be "no genuine issue as to any material fact," since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial. The moving party is "entitled to a judgment as a matter of law" because the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof.

Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).

Rule 56(e) provides that, when a properly supported motion for summary judgment is made, the adverse party "must set forth specific facts showing that there is a genuine issue for trial." Anderson, 477 U.S. at 250. Rule 56(e) therefore requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the "depositions, answers to interrogatories, and admissions on file," designate "specific facts showing that there is a genuine issue for trial." Celotex, 477 U.S. at 324.

Summary judgment is disfavored in employment discrimination cases, as such cases are "inherently fact-based." Mayer v. Nextel West Corp., 318 F.3d 803, 806 (8th Cir.2003) (quoting Keathley v. Ameritech Corp., 187 F.3d 915, 919 (8th Cir.1999)). Nonetheless, summary judgment is proper when a plaintiff fails to establish a factual dispute on an essential element of his case. Simpson v. Des Moines Water Works, 425 F.3d 538, 542 (8th Cir. 2005).

The ADA prohibits covered employers from discriminating against an otherwise qualified individual with a disability on account of that disability.[2] In the

---

[2] "The disability discrimination provisions in the NFEPA are patterned after the ADA, and the statutory definitions of 'disability' and 'qualified individual with a disability' contained in the NFEPA are virtually identical to the definitions of the ADA." Orr v. Wal-Mart Stores, Inc., 297 F.3d 720, 723 (8th Cir. 2002) (comparing Neb. Rev. Stat. § 48-1102(9) & (10) to 42 U.S.C. §§ 12102(2), 12111(8)). "In construing the NFEPA, Nebraska courts have looked to federal decisions, because the

3

absence of direct evidence of discrimination, claims are evaluated under the burden-shifting framework of McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). Kratzer v. Rockwell Collins, Inc., 398 F.3d 1040, 1044 (8th Cir. 2005). First, an employee must make out a prima facie case by showing that "(1) the employee is disabled within the meaning of the ADA; (2) the employee is qualified (with or without reasonable accommodation) to perform the essential functions of a job; and (3) the employee suffered an adverse employment action because of the disability." Henderson v. Ford Motor Co., 403 F.3d 1026, 1034 (8th Cir.2005). Once the employee establishes a prima facie case, the employer must proffer a legitimate, nondiscriminatory reason for the adverse employment action. Id. If the employer puts forth such a reason, the employee has the burden of demonstrating that the proffered reason is merely a pretext for discrimination. Id.

As stated above, I find that Rehrs has established there is a factual dispute as to the first essential element of his discrimination claim, but not as to the second. I do not reach the third element, but note that Rehrs appears to be claiming that he suffered an adverse employment action beginning in December 2003, when he was placed on temporary partial disability leave rather then being allowed to continue to work a fixed shift schedule that had been implemented as a temporary (60-day) accommodation when Rehrs returned to work following heart surgery. It further appears that Rehrs was granted total disability leave and benefits in February 2005, and that he is not now capable of returning to work in any capacity. Thus, the relevant time period for the claimed discrimination is between December 2003 and February 2005.

---

NFEPA is patterned after Title VII and the ADA." Id. (citing Father Flanagan's Boys' Home v. Agnew, 590 N.W.2d 688, 693 (Neb. 1999); IBP, Inc. v. Sands, 563 N.W.2d 353, 357-59 (Neb. 1997). I therefore will employ the same analysis to determine whether Rehrs' diabetes constitutes a disability under both the ADA and the NFEPA. See id.

4

### *A. Is Rehrs' Diabetes a "Disability"?*

As a threshold matter, Rehrs must produce sufficient evidence to demonstrate that he has a disability within the meaning of the ADA. Krauel v. Iowa Methodist Med. Ctr., 95 F.3d 674, 677 (8th Cir.1996) ("The threshold requirement for coverage under the ADA is that the plaintiff be a 'qualified individual with a disability.'"). The ADA provides several definitions for "disability,"[3] but Rehrs only claims that he is disabled because he has "a physical . . . impairment that substantially limits one or more of [his] major life activities." 42 U.S.C.A. § 12102(2)(A) (West 2005). Specifically, Rehrs claims that his diabetic condition substantially limits the major life activity of eating.[4]

---

[3] The ADA fully defines a "disability" as either:

(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual;

(B) a record of such an impairment; or

(C) being regarded as having such an impairment.

42 U.S.C.A. § 12102(2) (West 2005).

[4] When asked to "identify all 'impairments' as that term is defined by the ADA and NFEPA that are the basis for Plaintiff alleging he has a 'disability' as that term is defined by the ADA and NFEPA," Rehrs responded:

Type I diabetes and its accompanying complications including heart and circulatory conditions and diabetic retinopathy.

Plaintiff's Answer to Interrogatory No. 13. (Filing 68, Ex. 5, p. 4.) He was next asked to "describe all 'major life activities' as that term is defined by the ADA and NFEPA that are 'substantially limited' as that term is defined by the ADA and NFEPA by [such] 'impairments' . . . and how each impairment specifically 'limits' each such 'major life activity.'" Rehrs responded:

5

The Eighth Circuit has recognized that insulin-dependent diabetes is an impairment within the meaning of the ADA. Kells v. Sinclair Buick-GMC Truck, Inc., 210 F.3d 827, 831 (8th Cir. 2000). It has also stated that eating qualifies as a major life activity. Weber v. Strippit, Inc., 186 F.3d 907, 914 (8th Cir. 1999); Amir v. St. Louis University, 184 F.3d 1017, 1027 (8th Cir. 1999); Land v. Baptist Medical Center, 164 F.3d 423, 424 (8th Cir. 1999).

---

> Eating: Type I diabetics do not produce insulin. As a result, high blood-sugar or glucose levels can get way too high (or low) which can lead to unconsciousness, coma and death if not promptly corrected. Since my body does not produce insulin to break down sugars I have to significantly limit the amount of carbohydrates that I eat because the more carbohydrates that I eat, the higher my blood-sugar levels will be. Consequently, I have to be keenly aware of the number of carbohydrates that are in any food that I am thinking about eating. I also have to very closely monitor what I have eaten in the [sic] previously in the day and note the amounts of carbohydrates in those items in order to calculate my the [sic] amount of carbohydrates that I can safely eat.
>
> Blood-sugar level is not only effected [sic] by carbohydrate intake but by other things as well, including, physical exertion, the time of the day, stress [and] other medical conditions. For example, I am told by doctors that stress significantly effects [sic] the ability to stabilize blood-sugar levels. In addition to stress, other medical conditions can reduce one's ability to stabilize blood-sugar levels. In my case I suffer from substantial cardiac and circulatory conditions which interfere interfere [sic] with my ability to stabilize my blood-sugar levels. It is also my understanding that the body works on daily rhythms which affect various metabolic functions. As a result, I have to always be keenly aware of all of these factors and taken them in to account prior to eating or, at times, making sure that I eat something. I also always try to have some food available that can quickly raise my blood-sugar level if it drops too low. It is very important that I consistently balance my food intake with insulin consistently in the right measures.

Plaintiff's Answer to Interrogatory No. 14. (Id., pp. 4-5.)

In order to claim a disability, Rehrs must demonstrate that his impairment (i.e., diabetes) "prevents or severely restricts" his ability to perform a major life activity (i.e., eating) compared with how unimpaired individuals normally perform the activity in daily life. See Fenney v. Dakota, Minnesota & Eastern R. Co., 327 F.3d 707, 715 (8th Cir. 2003) (decided with reference to major life activity of "caring for oneself" and quoting Toyota Motor Mfg., Kentucky, Inc. v. Williams, 534 U.S. 184, 198 (2002)). This is not an easy showing to make. "[M]ost disabilities from which people suffer," including diabetes, "do not have a substantial enough effect on their major life activities." Berg v. Norand Corp., 169 F.3d 1140, 1145 (8th Cir.1999) (quoting Dalton v. Subaru-Isuzu Auto., Inc., 141 F.3d 667, 675 (7th Cir.1998)). Indeed, the Supreme Court has indicated that diabetes is not a disability when it is controlled with insulin. See Sutton v. United Air Lines, Inc., 527 U.S. 471, 483 (1999). Also, "[a] 'disability' exists only where an impairment 'substantially limits' a major life activity, not where it 'might,' 'could,' or 'would' be substantially limiting if mitigating measures were not taken." Id., at 482. Therefore, it is not appropriate to consider "what would or could occur if [Rehrs] failed to treat his diabetes or how his diabetes might develop in the future." Orr, 297 F.3d at 724.

While Rehrs does not make an especially compelling case for finding that his diabetes substantially limits his ability to eat, I conclude that he has presented enough evidence to survive P&G's summary judgment motion on this issue of "disability." In particular, I note the deposition testimony and written report of Michael A. Pace, M.D., who has been treating Rehrs for his diabetes.[5] Dr. Pace states the Rehrs, who was diagnosed with Type I diabetes when he was 12 years old, has developed many complications, including diabetic retinophathy, coronary artery disease, peripheral

---

[5] In responding to a Nebraska Equal Opportunity Commission medical questionnaire, Dr. Pace checked "No" when asked whether Rehrs was substantially limited in his ability to perform the major life activity of eating. (Filing 68-20, Defendants' Exhibit 14.) Rehrs has moved to strike this exhibit on relevancy grounds. (Filing 75-7.) I find that the document is relevant, but not conclusive of the issue of disability. Rehrs' motion to strike the exhibit will be denied.

7

vascular disease, and erectile dysfunction, and that since suffering a heart attack and undergoing bypass surgery in February 2002, Rehrs has experienced problems in controlling his blood sugars. Considering the generally poor state of Rehrs' health, and his increased need to closely monitor and control his blood sugar level, a jury might reasonably conclude that Rehrs' eating ability has been severely restricted. See Branham v. Snow, 392 F.3d 896, 902-04 (7th Cir. 2004) (a trier of fact rationally could determine that plaintiff's diabetes and treatment regimen substantially limit him in the major life activity of eating); Fraser v. Goodale, 342 F.3d 1032, 1039-43 (9th Cir. 2003) ("brittle diabetic" presented a genuine issue of material fact as to whether her diabetes and her rigorous treatment regimen substantially limit the major life activity of eating); Lawson v. CSX Transp., Inc., 245 F.3d 916, 923-24 (7th Cir. 2001) (a jury could find that the prescribed treatment plaintiff must take to survive with diabetes causes symptoms that substantially limit the major life activity of eating).[6] Cf. Collado v. United Parcel Service, Co., 419 F.3d 1143, 1155-57 (11th Cir. 2005) (no jury reasonably could find from plaintiff's testimony that he was substantially limited in eating; plaintiff merely testified that he had to "watch" what he eats and avoid certain foods—"mostly sugars"—because of his diabetes; plaintiff also admitted that as long as he is taking insulin he can eat and digest his food normally, and that his diabetes has not affected his lifestyle in any way).

### B. Is Shift Rotation an Essential Function of Rehr's Job?

To be a "qualified individual" within the meaning of the ADA, Rehrs must (1) possess the requisite skill, education, experience, and training for his position; and (2) be able to perform the essential job functions, with or without reasonable

---

[6] In Orr, the Eighth Circuit declined to consider whether it would follow Lawson because the issue was raised for the first time on appeal. See 297 F.3d at 724-25. I assume for purposes of ruling on the pending motions that our Court of Appeals would agree with the Seventh Circuit that the major life activity of eating can be severely restricted for a person with insulin-dependent diabetes even though such person is physically capable of ingesting food.

8

accommodation. Heaser v. Toro Co., 247 F.3d 826, 830 (8th Cir. 2001). Although an ADA plaintiff retains the ultimate burden of proving that he is a qualified individual, an employer who disputes the plaintiff's claim that he can perform the essential functions of a job must put forth evidence establishing those functions. Id., at 831. An essential function may be established by evidence that includes: (1) the employer's judgment as to which functions are essential; (2) written job descriptions prepared before advertising or interviewing applicants for the job; (3) the amount of time spent on the job performing the function; (4) the consequences of not requiring the incumbent to perform the function; and (5) the current work experience of incumbents in similar jobs. Id. Job restructuring is a possible accommodation, but an employer is not required to reallocate essential functions of the employee's job. Id. (citing Treanor v. MCI Telecomm. Corp., 200 F.3d 570, 575 (8th Cir.2000); Benson v. Northwest Airlines, Inc., 62 F.3d 1108, 1112-13 (8th Cir. 1995)).

P&G contends that shift rotation is an essential function of Rehrs' job because all of its production level employees are required to work rotating shifts as members of a team. If this contention is correct, then the accommodation that Rehrs seeks (i.e., that he alone not be required to work rotating shifts) is unreasonable per se.

P&G has presented substantial evidence in support of its position, including affidavits from Michael Lindsey, a global human resources director for Proctor & Gamble, and Kimberly Schanaman, formerly the human resources director at P&G's plant in Aurora, Nebraska, where Rehrs is employed. Rehrs has moved to strike both affidavits as irrelevant. (Filings 75-6, 75-8.) Those motions will be denied.

Lindsey's affidavit reads:

> 1. I am currently the Director for Global Human Resources for P&G Beauty at the Proctor & Gamble Company ("P&G").
>
> 2. I have worked for P&G for 24 years.

9

3. I have served P&G in numerous positions including mechanical engineer, operations manager, human resources manger [sic], and currently as a global human resources director. I have worked as a human resources manager and director at the operations, corporate, and global levels.

4. I am professionally trained in organizational effectiveness and I have completed extensive organization assessment and design training at P&G.

5. I also serve as a global instructor in High Performing Work Systems throughout P&G operations. I have led and consulted on organization design and major organizational change efforts at P&G at the module, plant, organization, functional, and global business levels.

6. From my various positions with P&G, I have direct experience in implementing High Performing Work Systems, converting traditional plant work systems to High Performing Work Systems, and accelerating existing High Performing Work System designs to higher levels of results and productivity.

7. P&G began research with academia and consultants in the 1950s and 1960s to study different work systems. Out of this research, P&G developed an organizational effectiveness technology known as a High Performing Work System ("HPWS").

8. P&G began implementing its HPWS in its newly created production facilities in the late 1960s.

9. Beginning in the early 1980s, P&G began transitioning its existing production facilities from traditional work systems to HPWS.

10. An essential component of P&G's HPWS is that production level employees work rotating shifts.

11. P&G implemented rotating shifts for production level employees as part of its HPWS because it learned that rotating shifts keeps all employees better connected to the business.[7]

12. One key advantage to rotating shifts is that it gives all employees, including employees who would work exclusively on the night shift in a traditional work system, exposure to management employees, more resources, suppliers, and outside customers with whom the company only interfaces during the day shift. This provides all employees additional opportunities for training and development to further their career opportunities in the company and, in turn, increases productivity for P&G.

13. Eliminating rotating shifts would harm both the company from a production standpoint and employees from a development and career advancement standpoint.

14. Working in teams is also an essential component of the HPWS.

15. A team consists of multiple people, all with various skill levels, all of whom have the ability to operate the equipment used in their positions. The goal of the team in a HPWS is for each team to become self-sustaining, require minimal management and increase productivity.

16. Each team rotates together. Allowing a team member to remain on a fixed shift would undermine the team concept and, correspondingly, the goal of the team becoming self-sustaining and increasing productivity.

17. Each production facility has certain "off-line" roles that do not have shift rotation as an essential element. These "off-line" roles consist of administrative positions that must interface with customers

---

[7] Rehrs has also moved to strike paragraphs 11 and 13 of Lindsey's affidavit because they "are comprised of speculation and lack foundation." (Filing 75-6.) The motion will be denied.

11

and suppliers who conduct business exclusively during the day shift. Certain management positions also work in these "off-line" roles for the same reason.

18. P&G converts all new operations it acquires to a HPWS.

19. After P&G acquired The Iams Company in August 1999, it began converting all Iams production operations, including the Iams plant in Aurora, Nebraska, to HPWS.

20. Although there is flexibility in certain elements of HPWS, all HPWS have shift rotation as an essential element.

21. To my knowledge, all production level employees work rotating shifts in all production facilities owned and operated by P&G in the United States.

22. I am aware that P&G employees have requested permanent reassignment from working rotating shifts in the past but, to my knowledge, P&G has never granted such a request.

(Filing 68-8, Defendants' Exhibit 3.)

Schanaman's affidavit reads:

1. I am currently the Logistics Manager at The Iams Company production facility in Aurora Nebraska (the "Plant").

2. During the period in which Murray Rehrs worked at the Plant, I served as the Plant Human Resources Manager ("HR Manager") and I reported directly to the Plant Manager.

3. As the HR Manager, my job duties included oversight of hiring and recruiting process, training, benefits, policy development and implementation, and employee relations.

4.  The Plant is primarily responsible for making, packing, and shipping pet food for The Iams Company.

5.  Hourly employees who work in the production areas of the Plant (make, pack, and ship) are referred to as "technicians."

6.  Murray Rehrs held the position of warehouse technician in the shipping area of the Plant.

7.  The Iams Company was acquired by Proctor & Gamble Company in August 1999.

8.  In January 2000, the Plant began implementation of the Proctor & Gamble High Performing Work System ("HPWS").

9.  Under the HPWS, the Plant changed its operational hours from a five day, 24 hour schedule to a seven day, 24 hour schedule. In other words, the Plant was now operating seven days a week, 24 hours a day.

10.  Under the HPWS, the Plant incorporated "flow to the work," which meant at any time a technician from one department may have to move to another department because of the absence of another technician or in a work crisis.

11.  Under the HPWS, the Plant also changed its operational shifts from three 8 hour shifts to two 12-hour rotating shifts for technicians. Technicians were required to rotate shifts with their respective teams.

12.  In January 2000, the Plant developed site-wide essential functions for all technician positions. See site-wide essential functions, attached as Ex. "A."[8]

---

[8] Rehrs has filed a motion to strike this exhibit, which also appears as Defendants' Exhibit 4 (filing 68-9), as hearsay and as lacking foundation. The motion (filing 75-9) will be granted. Insofar as Schanaman quotes from the exhibit in paragraph 13 of her affidavit, I also will not consider those statements.

13. The Site Wide Essential Functions include "Work Consistently with a team and demonstrate effective team skills: Work the same schedule as team including 12 hour rotating shifts on a seven day continuous schedule." Ex. "A."

14. All technicians were informed of the Site Wide Essential Functions (Ex. "A") and the list of Site Wide Essential Functions is given to all applicants for technician positions at the Plant.

15. There are certain "off-line" roles at the Plant for which employees do not work rotating shifts. These roles are administrative or management roles that require employees to interface with outside customers, suppliers, and other outside parties who work exclusively on the day shift. Some technicians also work on special "off-line" assignment on a temporary basis and then return to their core job with rotating shift responsibilities.

16. Mr. Rehrs was informed of the Site Wide Essential Functions and that as a warehouse technician he was required to work a 12 hour rotating shift requirement.

17. In fact, Mr. Rehrs worked the 12-hour shift from January 2000 until his heart attack in February 2002, when he went on short-term disability leave for his heart attack and subsequent heart surgery.[9]

18. When Mr. Rehrs returned to work from his disability leave in or around July or early August 2003, he requested an accommodation from working rotating shifts for his diabetes. Specifically, he requested to be assigned to a fixed 8-hour day shift.[10]

---

[9] Rehrs' application for disability benefits is filed as Defendants' Exhibit 6 (filing 68-10). Rehrs has moved to strike this exhibit as irrelevant. (Filing 75-4.) The motion will be denied.

[10] Rehrs has moved to strike paragraphs 18, 21, 22, and 24 of Schanaman's affidavit on foundational grounds. (Filing 75-8.) The motion will be granted to the extent that Schanaman states that Rehrs requested assignment to an 8-hour shift. Although not referenced by Schanaman, there is a notation on a prescription pad,

14

19. On September 15, 2004, Dr. Michael Pace, Mr. Rehrs physician, submitted a letter to the Plant stating that Mr. Rehrs was having difficulty maintaining his blood sugar and requesting that "[f]or the moment it is desirable for [Mr. Rehrs] to be on a regular day night problem (sic) without any changes until we can get his (sic) figured out." It was unclear from the letter whether this was a request for a temporary or permanent accommodation from working rotating shifts. See Letter from Dr. Pace dated September 15, 2003, attached as Exhibit "B."[11]

20. Based on the request from Mr. Rehrs and his physician, the Plant granted Mr. Rehrs a temporary accommodation and allowed him to work exclusively 8 hour day shifts for 60 days in an attempt to help him bring his blood sugar level under control.

21. During this period of time, I requested more information from Dr. Pace to determine if the request was for a permanent or temporary accommodation. Subsequent correspondence from Dr. Pace and

---

signed by James Flynn, M.D., and dated June 25, 2002, which indicates that Rehrs should work "8 hr shifts" and "days only." (Filing 68-12, Defendants' Exhibit 7.) Rehrs' motion to strike this exhibit as irrelevant (filing 75-5) will be denied. Also in this regard, Rehrs has moved to strike a portion of his own deposition testimony (filing 68-6, Defendants' Exhibit 1, at 128:11-16) in which he was asked if he had requested an accommodation to work an 8-hour shift. That motion (filing 75-3), which is based on both relevancy and foundational objections, will be denied.

[11] Dr. Pace actually wrote:

Mr. Rehrs is a patient of mine and has been for some time. He has type 1 diabetes and is on an insulin pump. Unfortunately we are having some difficulties in controlling his blood sugars which drop precipitously For the moment it is desirable for him to be on a regular day night <u>program</u> without any changes until we can get <u>this</u> figured out. I think because of his shift changes he may have increased difficulties in maintaining normal sugars.

(Filing 68-7 at 8) (emphasis supplied).

15

requests from Mr. Rehrs indicated that Mr. Rehrs' requested accommodation was for permanent reassignment to an 8-hour day shift. See Letters from Dr. Pace to the Aurora Plant, dated October 7 and 29, 2003, attached hereto as Ex. "C."[12]

22. Because working rotating shifts is an essential function of the Warehouse Technician position, I informed Mr. Rehrs that we could not accommodate his request to work an 8-hour straight day shift on a permanent basis.

23. However, we encourage Mr. Rehrs to apply for a Sanitation position that was a straight day shift that we anticipated would last six to nine months. Mr. Rehrs did not apply for the position stating "I do not want to clean toilets."

24. Because Mr. Rehrs was unable to perform the essential functions of the Warehouse Technician position and he was not interested in the Sanitation position, he applied for and was granted temporary partial disability leave.

25. During the period Mr. Rehrs was on temporary partial disability leave, the Plant sent him numerous job postings for which he may qualify and for which we encouraged him to apply. See Job postings sent to Mr. Rehrs, attached as cumulative Ex. "D."[13]

26. Mr. Rehrs only responded to two of the job postings the Plant sent to him–Shipping Coordinator and the SAP Production Execution position.

---

[12] Dr. Pace actually stated in both letters that he was recommending a 12-hour daytime shift. (Filing 68-7, at 9-10).

[13] The job postings are also filed as Defendants' Exhibit 12 (filing 68-16 &17). Rehrs has moved to strike this evidence, and also a letter that he sent requesting job postings, filed as Defendants' Exhibit 13 (filing 68-18), as irrelevant. (Filing 75-2.) The motion to strike will be denied.

>    27. Mr. Rehrs interviewed for the Shipping Coordinator position, but was not qualified because of his lack of experience.
>
>    28. Rehrs withdrew his application for the SAP Production Execution position saying he was not interested.

(Filing 68-7, Defendants' Exhibit 2.)

Rehrs's controverting evidence consists of affidavits submitted by two of his co-workers, Bill Rudy (filing 64-5) and Randy Peard (filing 64-7). Basically, Rudy opines that shift rotation is not an essential function of the warehouse technician position because P&G could operate with fixed shifts, while Peard states that P&G outsourced the warehouse operation to another company, Excel, in March 2005, and that Excel employees work fixed shifts. Defendants have moved to strike Rudy's affidavit because he was not designated as an expert and to strike Peard's affidavit because he was not listed as a potential witness. (Filing 78.) Defendants' motion to strike will be denied.

Disregarding conclusory statements in both sides' affidavits, I find no real dispute over the "essential function" issue. Quite simply, the evidence shows that during the period from January 2000 until March 2005, P&G's standard operating procedures required all production level employees at the Aurora plant, including warehouse technicians, to work rotating shifts. The fact that straight shifts were in effect at the plant before January 2000 and at the warehouse after March 2005 is immaterial. It is well-established "that the employment discrimination laws have not vested in the federal courts the authority to sit as super-personnel departments reviewing the wisdom or fairness of the business judgments made by employers, except to the extent those judgments involve intentional discrimination." Grabovac v. Allstate Ins. Co., 426 F.3d 951, 955 (8th Cir. 2005) (quoting Hutson v. McDonnell Douglas Corp., 63 F.3d 771, 781 (8th Cir.1995)). Requiring Rehrs to work as part of a team was not discriminatory.

## II. CONCLUSION

Even assuming that Rehrs' diabetic condition qualifies as a disability for purposes of the ADA and the NFEPA, he is not a "qualified individual with a disability" because he claims an inability to work a rotating shift, which is an essential function of his employment.

IT IS ORDERED that:

1. Plaintiff's amended motion for leave to amend (filing 82) is granted <u>instanter</u>.

2. Plaintiff's original motion for leave to amend (filing 73) is denied without prejudice, as moot.

3. Plaintiff's motion for summary judgment (filing 63), as amended, is denied.

4. Plaintiff's motion to strike evidence (filing 75) is granted in part and denied in part, as follows:

    a. Filing 75-8 (motion to strike affidavit of Kim Schanaman) is granted only insofar as Schanaman states that Rehrs requested assignment to a 8-hour shift;

    b. Filing 75-9 (motion to strike site wide essential functions) is granted; and

    c. In all other respects, the motion (filing 75-1 though 8) is denied.

5. Defendants' motion to strike evidence (filing 78) is denied.

6. Defendants' motion for summary judgment (filing 66) is granted.

7. Judgment will be entered by separate document.

February 6, 2006.                    BY THE COURT:

                                     s/ *Richard G. Kopf*
                                     United States District Judge